## East St. Louis & Suburan Railway Company v. Mary Kath, Administratrix.

INSTRUCTIONS—*how to be construed.* Instructions are to be considered as a series and the omissions of one may be supplied by the contents of another.

Action to recover damages for death caused by alleged wrongful act. Appeal from the Circuit Court of St. Clair County; the Hon. R. D. W. HOLDER, Judge, presiding. Heard in this court at the August term, 1906. Affirmed. Opinion filed March 15, 1907.

SCHAEFER & FARMER, for appellant.

KEEFE & SULLIVAN, for appellee.

MR. JUSTICE HIGBEE delivered the opinion of the court.

This was an action brought by appellee to recover damages for the benefit of the next of kin of Antone Kath, whose death is alleged in her declaration to have been caused by

the negligence of appellant, in placing one of its poles too near its track and negligently permitting said pole to incline inward, toward the track, and also negligently permitting a low place to be and remain under the rail adjacent to the line of poles opposite said pole, thereby bringing the cars passing on said track, in dangerous proximity to said pole; by reason of which the deceased, while acting as conductor of one of appellant's cars, and while exercising due care and caution for his own safety, in the performance of his duties as conductor, in charge of one of said cars, and while looking out of said car, in the performance of his duty, while passing said pole was struck by the same and killed. The trial resulted in a verdict and judgment in favor of appellee for $2,500.

Appellant here insists that improper evidence was admitted for appellee; that the location of the poles along appellant's track was an engineering question and the fact that they were placed near the track, was not evidence of negligence on the part of appellant; that the injury was caused by an assumed risk and by the negligence of deceased himself.

The facts as disclosed by the record are substantially as follows:

On December 6, 1904, appellant owned and operated an electric railway running from Edwardsville, in Madison county, to French Village, in St. Clair county. It operated its cars by means of an overhead trolley system and had its poles which supported the trolley wire about four feet from the rail. From these poles arms from which a trolley wire was suspended, extended to the center of the tracks. About one mile north of Maryville on appellant's road, it had its sheds, where cars were stored over night, and from which point the cars started. From the Maryville sheds to French Village, some ten miles south, appellant operated daily a special car, known as the French Village special, which left the Maryville sheds in the morning to take miners along the line to the mines near French Village, and also ran down in the evening to bring them back from their day's work. Appel-

lant's track from the sheds to Maryville was practically straight and about half way between the two was a trolley pole, No. 649. The preponderance of the evidence showed that at the time named this pole was out of range with and was set nearer the track, than the other poles; that it leaned towards the track and about 13 feet from the ground it bowed in toward the track.

Evidence was introduced on the part of appellee tending to show there was a low joint in the track on the side next to the pole and near to it, which would cause a car running by the pole to come closer to it than it otherwise would have done. This evidence was sharply contradicted by evidence introduced on the part of appellant.

Antone Kath, the deceased, had been working for the company since the previous April. He worked principally as motorman, but occasionally acted in the capacity of conductor. On the afternoon of the day named, Kath, as conductor, and Walter Bruening, as motorman, were assigned to run the French Village special. The car proceeded on its journey towards French Village, with no person upon it except Kath and Bruening, both of whom were riding on the front platform or vestibule. About half a mile south of the sheds the car ran through a flock of chickens on the highway crossing. Kath remarked to Bruening, "I'll bet you got that rooster," stepped over to the edge of the platform upon the lower step, took hold of the handlebar on the side of the door and leaned over to look back at the chickens. As he did so the motorman called to him "look out for the pole." The warning however came too late and Kath was struck behind the right ear by pole No. 649, knocked from the car and received injuries from which he shortly afterwards died.

At that time there was a printed rule of the company in force which provided "that the proper position of the conductor, when not collecting fares, or performing other necessary duties, is on the rear platform, giving attention to the trolley and closely observing the passengers so as to catch signals from them to stop car, to see that they do not spit in the car, put feet on seats or indulge in any unseemly conduct.

The conductor would then be in proper position to assist passengers in getting on or off the car and to signal the motorman." It is claimed by appellant that by reason of this rule, Kath was wrongfully riding on the front platform and that had he been on the rear platform he would not have been injured. On the other hand it was claimed by appellee that as this was a special car which was to go to Edgemont, a distance of five or six miles, without stop and consequently could take no other passengers before reaching that place, it was not necessary for the conductor to stand on the rear platform to perform any of the duties required of him by the rule, and that therefore the rule had no application to the circumstances under which the car was being run; that the rule did not prohibit the conductor from going to the front vestibule, where some of his duties must be performed, and that there was a rule in force, as shown by the evidence, requiring conductors to report all property injured or destroyed, and that by standing on the front platform he was in position to see and report accidents and damages to property.

It appears that no measurements of the distance between the pole which caused the injury, and the rail of appellant's track next to it, were made for some time after the injury, but that some months thereafter appellee caused the distance to be measured. Appellee was permitted to prove by two witnesses, over the objection of appellants, that after the injury and before the distance was measured by appellee, appellant had moved the pole back from the track and straightened it up. Appellant says that the question of negligence should be determined only by what occurred before and at the time of the accident, and evidence of repairs made after the accident, was not admissible. Many cases are cited by appellant in support of its position, but it is clear that in these cases the reason why the evidence was held to be improper was that it was introduced for the purpose of showing an implied confession of negligence on the part of the defendant, in making the change. Such however is not the case here. Measurements were made by appellee, as also

by appellant, long after the injury occurred and in the absence of any explanation the jury would have properly inferred that the pole was in the same position, relative to the track, when the measurement was made, that it was on the day of the injury. In seeking to establish the original position of the pole it was therefore perfectly proper for appellee to show, if possible, that the pole had been moved and was not in the same proximity to the track that it was when Kath was injured.

In support of appellant's claim that the location of the poles by the side of appellant's track was an engineering problem he cites C. & E. I. R. R. Co. v. Driscoll, 176 Ill., 330, which holds that the manner of constructing a railroad, is an engineering question, and that a railroad company cannot be required to adopt any particular method of construction, or any particular contrivance or device, in order to be in the exercise of ordinary care, for the safety of its employees.

It was held in C. & A..R. R. Co. v. Howell, 208 Ill., 155 (109 Ill. App., 546), M. & O. R. R. Co. v. Vallowe, 115 Ill. App., 621, and numerous other cases decided by our courts, that in those cases, the employees did not necessarily assume the risk of dangers of posts, switch stands, coal chutes and other constructions erected so close to the tracks, as to be dangerous. It is said in appellant's brief, that the condition of affairs existing in this case, is different from those which apply to the steam railroads involved in said cases, for the reason that the dangerous constructions were not necessary to the operation of the engines, cars or trains of the steam road, and therefore the employees engaged in the operation of the trains were not required to notice the location of such constructions; but that in this case it appears that the poles bearing the trolley wires, were necessarily located close to the track and that every employee engaged in the operation of the cars, could not but have notice and know of the proximity to the pole. But even if it were granted that the general location of the poles along the line of appellant's track, was an engineering problem, and that em-

ployees running appellant's cars were charged with notice of the rule governing the general location of the same, yet that rule would not apply in this case for the reason that the pole in question was not located so as to comply with the rule adopted by appellant for the location of its poles, but for some reason it was located slightly nearer the track and was bowed in towards the track, when, as the evidence shows, the bow or bend of the pole should have been located in the line of the poles, and it was also leaning over towards the track. This pole therefore did not comply with the general rule adopted by appellant, for the location and maintenance of its poles, but had been permitted, by appellant, to occupy a position different from the other poles and which apparently made it more dangerous to employees and passengers. It was therefore a question for the jury to say whether or not appellant in permitting the pole to occupy the position it did, was guilty of negligence which contributed to cause the death of appellee's intestate.

Appellant says that the court erred in giving the following instruction for appellee:

"The court instructs the jury that the servant only assumes the ordinary risks of the business, that is the risks which are so open and obvious that they may be discovered by the servant, by the use of ordinary care; and the servant also assumes such risks as are known to him, but the servant does not assume extraordinary risks which are unknown to him and which could not be discovered by the exercise of ordinary care, and he does not assume risks due to the master's own negligence."

It is said in appellant's brief that the serious error of this instruction, is the conclusion which states that the servant does not assume risks due to the master's own negligence; that this statement of the law is correct only when the risks were unknown to the servant, and could not have been discovered by him, by the exercise of ordinary care, and that the instruction should have so stated. The proposition of law mentioned states correctly a general principle of law and

upon this subject our Supreme Court has said that "the law is that the servant does not assume risks that are unreasonable or extraordinary; nor risks that are extrinsic to the employment; nor risks of the master's own negligence." City of La Salle v. Kostka, 190 Ill., 130. While such is the general rule, it is however not intended to apply to cases where the servant has knowledge of the danger and continues in the service. This court has said in St. Louis National Stock Yards v. Morris, 116 Ill. App., 107: "In addition to hazards ordinarily incidental to the business he (the servant) is held to assume the risk of all danger apparent or within his knowledge, by direct notice or otherwise, even though the circumstance or condition of danger is caused by the master's negligence. * * * If by negligent act or omission of the master, the danger of his occupation is enhanced, and with knowledge and appreciation of the added risk, he voluntarily continues in the service, he may not recover for injuries caused by such act or omission. Browne v. Siegel, Cooper Co., 191 Ill., 226."

This instruction plainly told the jury that the servant assumed such risks as were known to him or were so open and obvious that they might be discovered by the servant, by the use of ordinary care. Numerous other instructions of the series told the jury, in various ways, that if appellee's intestate knew of the dangers occasioned by the condition of the track or pole at the point in question, or by the use of ordinary care could have known them, he assumed the risk and could not recover. While the language of this instruction is not carefully guarded, yet when the whole instruction is taken together, and it is considered together with the series of instructions, and applied to the evidence in this case, we are of opinion that the jury could not have been misled upon the subject treated of therein.

The objections urged against two other instructions given for appellee apply to slight informalities not affecting their legal merit.

Whether deceased assumed the risk of the danger caused by the condition of the track or the proximity of the pole by

8

which he was injured and whether he was, at the time, in the exercise of ordinary care and caution for his own safety, were questions of fact to be determined by the jury, under instructions as to the law, from the court.

Upon these questions there was an abundance of evidence tending to support appellee's case, and while this evidence was to some extent contradicted by evidence offered on the part of appellant, yet upon the whole record, the evidence is such that we are not at liberty to disturb the verdict.

The judgment of the court below will be affirmed.

*Affirmed.*